**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SERVOTEC USA, LLC,**

                      **Plaintiff,**

   vs.                                                 **1:11-CV-0049**
                                                          **(MAD/RFT)**

**RUAG AMMONTEC USA, INC. f/k/a PRECISION**
**AMMUNITION, LLC.,**

                      **Defendant.**
_____

**APPEARANCES:**                                    **OF COUNSEL:**

OFFICE OF WILLIAM J. BETTER          Jared P. Yafee, Esq.
1 Albany Avenue
Kinderhook, New York 12106
*Attorneys for Plaintiff*

PISCIOTTI, MALSCH & BUCKLEY, P.C.     Jeffrey M. Malsch, Esq.
445 Hamilton Avenue
Suite 1102
White Plains, New York 10601
*Attorneys for Defendant*

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

      Presently before the Court is a motion by defendant Ruag Ammotec USA, Inc. f/k/a Precision Ammunition, LLC ("defendant" or "Ruag") pursuant to Fed. R. Civ. P. 12 (c) for judgment on the pleadings and dismissal of plaintiff's claims of fraud, misappropriation of trade secrets and proprietary information and injunctive relief. (Dkt. No. 11). In response to the motion, plaintiff Servotec USA, LLC ("plaintiff" or "Servotec") filed a cross motion seeking judgment on the pleadings and dismissal of defendant's Counterclaim. (Dkt No. 13).

## COMPLAINT[1]

Plaintiff is in the business of mechanical press manufacturing and tooling with its principle place of business in Hudson, New York.  Defendant is in the business of small-caliber ammunition manufacturing with its principle place of business in Tampa, Florida.  Thomas Tanguay is the owner, President and Chief Operations Officer for plaintiff.  Daniel L. Powers, Jr. is the Chief Executive Officer for defendant.

On January 22, 2009, defendant inquired about plaintiff's services to remanufacture five of defendant's munition loading V&O Presses built in 1940.[2]  The presses are industrial-sized punch presses used to manufacture small-caliber ammunitions, such as 9-millimeter, 40 S&W and 45 ACP bullets.   Over the next five months, defendant and plaintiff communicated concerning the remanufacturing process for the subject presses.   In June 2009, defendant shipped the five presses to plaintiff.  On June 23, 2009, plaintiff issued five invoices for $10,000.00 each to disassemble the presses and evaluate the parts.  Defendant paid these invoices.

Plaintiff claims that defendant subcontracted with other companies to provide equipment for the remanufacture.  Plaintiff alleges that the remanufacturing process was delayed due to defendant's subcontractors and Powers "indecisiveness about the tooling of the presses".

In October 2009, Powers visited plaintiff's manufacturing site in Hudson, New York.  On October 26, 2009, Tanguay provided Powers with a status report memorializing the parties' agreement for the work to be performed with a quote of $139,998.00 for the cost to remanufacture each press for a total cost of $699,990.00. With regard to installation and commission, the letter provided:

---

[1] The background information is taken from the complaint.  These are not findings of fact by the Court.

[2] V&O Press Company went out of business in or around 1987.

> SERVOTEC USA will also provide 3 days of onsite set up and commissioning to the customer, should any additional time be required by the customer, it will at the customer's expense and at SERVOTEC USA rate of $1200 dollars per day per technician. Other arrangements for commissioning can be discussed between RUAG-Ammotec USA and SERVOTEC USA at a later date. The cost does not include crating or special air ride transportation to the customer's location; however SERVOTEC USA is willing to provide the crating necessary to insure the safe travel of the press and hopper at the customer's expense; this cost can also be discussed at a later date.

At the time plaintiff forwarded this letter, defendant had made three deposits totaling $150,000.00. On October 27, 2009, Powers wrote a letter directing plaintiff to cease working on the presses until he obtained approval from defendant's parent company.[3] On October 28, 2009, Tanguay sent a letter and expenditure report to Powers informing him that he inadvertently omitted labor costs so the outstanding balance was increased to $51,264.00.

Plaintiff claims that Powers advised that the parent company would only authorize $500,000.00 for the remanufacture of the presses. On November 11, 2009, Powers visited plaintiff's site to meet with subcontractors to discuss the project. Powers authorized plaintiff to resume work. On February 18, 2010, Powers sent an email to Tanguay informing plaintiff that defendant needed the presses on March 31, 2010. On April 21, 2010, Powers visited plaintiff's site. Plaintiff claims that defendant needed the presses, "as soon as possible; however, the defendant and the defendant's subcontractors caused repeated delays". During this visit, Powers videotaped the first working press with his camera phone.

Plaintiff claims that Powers told Tanguay that defendant would pay for plaintiff's staff to travel to defendant's site in Florida on or about May 23, 2010 to install and commission the presses. Plaintiff claims that defendant hired subcontractors to install and commission the presses

---

[3] This letter is not part of the record. Plaintiff claims that Powers needed to obtain approval from the Board of Directors because the project exceeded his budget.

3

and that the subcontractors were at defendant's site as early as May 2010 working on the presses. On May 7, 2010, Powers and defendant's shop foreman visited plaintiff's site. At that time, one press had tooled and tested successfully. On May 11, 2010, Powers elected to take all presses early and hire other subcontractors to complete the tooling. The presses were shipped to Florida.

On June 8, 2010, Powers informed Tanguay by email that defendant was reviewing the outstanding invoices and the status and condition of the presses. On June 24, 2010, Tanguay sent an email to Powers asking if he could visit defendant's site the following week. On June 25, 2010, Powers emailed Tanguay informing him that he could not visit as, "[e]verything is being reviewed with our corporate offices and some individuals in the U.S." After June 25, 2010, plaintiff received no communication from defendant. On June 28, 2010, plaintiff forwarded an invoice for the overdue balance of $118,742.41. On August 1, 2010, plaintiff made a final demand for payment of the outstanding balance. Plaintiff subsequently learned that defendant paid one of its subcontractors directly and therefore, the overdue balance was reduced to $95,469.61.

Plaintiff's complaint sets forth eight causes of action including, *inter alia*, claims for breach of contract, breach of the implied covenant of good faith and fair dealing and unjust enrichment.[4] In the Fifth Cause of action (misnumbered as the Fourth Cause of Action), plaintiff alleges:

> Defendant promised that the parties would finish the project together and encouraged the plaintiff to continue working on the presses, notwithstanding the fact that the defendant had already contracted with the plaintiff's subcontractors to commission and install the presses.

---

[4] The complaint contains two causes of actions entitled "third" and "sixth" cause of action. Defendant does not seek judgment and dismissal of the breach of contract, breach of implied covenant or unjust enrichment claims.

4

> Plaintiff detrimentally relied on the defendant's promises when it expended considerable resources over the course of twelve (12) months to remanufacture and update the defendant's presses, including, but not limited to, manpower and finances for parts and subcontractors' labor.
>
> Had the defendant not promised to pay for the plaintiff's services, the plaintiff would not have allocated its manpower and finances to remanufacture and update the defendant's presses.
>
> Defendant defrauded the plaintiff out of the sum of $95,469.61.

Pltf. Complt. at ¶ 113-116.

In the Sixth Cause of Action (misnumbered as the Fifth Cause of Action), plaintiff claims that defendant misappropriated trade secrets:

> The materials in the V&O Press' engineering library, as well as the plaintiff's specifications and plans and commissioned specifications and plans from its subcontractors, are the plaintiff's proprietary information, which is not known to the public or others in the plaintiff's trade.
>
> The V&O Press Company's engineering library and the plaintiff's specifications and plans constitute the plaintiff's trade secrets.
>
> Defendant, in bad faith, has obtained the plaintiff's trade secrets for its pecuniary gain.
>
> Defendant misappropriated the plaintiff's trade secrets, and as a result, the plaintiff has suffered damages in the sum of $95,469.91.

Pltf. Complt. at ¶ 118-122.

In the Seventh Cause of Action (misnumbered as the Sixth Cause of Action), plaintiff alleges that defendant misappropriated proprietary information:

> Plaintiff owns the original V&O Press Company's engineering library.
>
> The materials in said library, as well as the plaintiff's own specifications and plans and commissioned specifications and plans from its subcontractors, are the plaintiff's proprietary information, which confers an economic advantage to plaintiff over its competitors.

5

> Defendant, in bad faith, has obtained the plaintiff's confidential proprietary information for its pecuniary gain.
>
> Defendant's misappropriation of the plaintiff's proprietary information has stripped the plaintiff of an economic advantage over its competitors, and, as a result, the plaintiff has suffered damages in the sum of $95,469.91.

Pltf. Complt. at ¶ 124-127.

In the Eighth Cause of Action (misnumbered as the Seventh Cause of Action), plaintiff seeks injunctive relief arguing, "[p]laintiff will suffer immediate and irreparable injury, loss and damage, if the defendants are permitted to continue using or disseminate the plaintiff's misappropriated confidential proprietary information and trade secrets".

## DISCUSSION

### I.  DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

### A.  Rule 12(c) Standard

The standard for a motion for judgment on the pleadings is identical to that applied to a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6). *King v. Am. Airlines, Inc.*, 284 F.3d 352, 356 (2d Cir. 2002). Therefore, in addressing defendant's motion the Court accepts as true all of the factual allegations in the complaint and draws inferences from those allegations in the light most favorable to plaintiff. *See Albright v. Oliver*, 510 U.S. 266, 268 (1994); *McEvoy v. Spencer*, 124 F.3d 92, 95 (2d Cir. 1997). Dismissal is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)) . Ordinarily, the Court must decide a Rule 12(c) motion to dismiss based upon the allegations in the complaint. The Court, however, may also consider "documents that the

6

plaintiff either possessed or knew about and upon which [he] relied in bringing the suit". *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

**B.     Fraud**

Plaintiff claims that defendant promised to allow plaintiff to install and commission the presses. Thus, plaintiff expended considerable resources, manpower and finances. Plaintiff claims that defendant never intended to allow plaintiff to perform such work as they, "had already hired third parties to complete the installation". Defendant argues that plaintiff has no fraud claim distinct from its breach of contract claim.[5] Specifically, defendant claims that, "an expectation of working together is not fraud".

Where a plaintiff pleads both a fraud claim and a breach of contract claim, the plaintiff must distinguish the two by (1) demonstrating a legal duty separate from the duty to perform under the contract, (2) demonstrating a fraudulent misrepresentation collateral or extraneous to the contract, or (3) seeking special damages caused by the misrepresentation and unrecoverable as contract damages. *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996). Although "a valid fraud claim may be premised on misrepresentations that were made before the formation of the contract and that induced the plaintiff to enter the contract," *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994), an assertion that the defendants made intentionally false statements regarding their intent to fulfill the terms of the contract is not sufficient to support a claim of fraud. *See Bridgestone/Firestone*, 98 F.3d at 19.

The Second Circuit has held that "simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim." *Telecom Int'l Am., Ltd.*

---

[5] Defendant does not argue that plaintiff has failed to plead fraud with particularity pursuant to Rule 9(b).

*v. AT & T Corp*., 280 F.3d 175, 195 (2nd Cir.2001).  Where the alleged fraudulent allegations "do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie.*"  S.O. Textiles Co., Inc. v. A & E Prod. Group, a Div. of Carlisle Plastics, Inc*., 18 F.Supp.2d 232, 240 -241 (E.D.N.Y. 1998).  "Defendant's post-contractual statements to conceal the breach of contract are also not actionable because intentionally false statements to conceal a breach of contract do not give rise to an action for fraud."  *See John Paul Mitchell Sys. v. Quality King Distrib., Inc*., 2001 WL 910405, at *5 (S.D.N.Y. 2001) (citing *Ikea N. Am. Servs., Inc. v. Northwest Graphics, Inc*., 56 F.Supp.2d 340, 342 (S.D.N.Y.1999).

Here, plaintiff has failed to identify any legal duty owed by defendant separate from the duty to perform under the contract, and there has been no showing of "special damages" caused by any misrepresentation other than the breach of contract, therefore, the fraud claim may only proceed if plaintiff can establish that  defendant's promise concerned a matter collateral or extraneous to the terms of the agreement. *John Paul Mitchell Sys*., 2001 WL 910405, at *4 (citations omitted).  In plaintiff's October 2009 letter, plaintiff specifically included the "3 days of onsite set up and commissioning to the customer" as part of the "cost for each system".  In opposition to defendant's motion, Tanguay provided an affidavit claiming that this offer was made as a "courtesy" and that, "installation and commission would take longer than three days" and that service was "separate and distinct from refurbishing and installing the presses".  *See* Tanguay Aff. at ¶ 13.  However, Tanguay also avers, "I was unaware that there was any kind of 'dispute' until Powers informed me on June 25, 2010, a month after defendant took possession of the presses, that I would not be welcome at defendant's site in Florida to install the presses." *Id.* at ¶ 17.  Based upon Tanguay's assertions, the installation and commission of the presses was

clearly related to the terms of the contract and not "extraneous" or "collateral". Plaintiff's allegations of fraud relate to the installation and commission of the presses and consequently, those allegations are inextricably linked to the terms of the contract. Plaintiff's attempt to characterize defendant's promise as a false representation of defendant's present state of mind is unpersuasive. The alleged promise does not amount to a misrepresentation of a material fact separate from or collateral to the alleged intent not to perform the contractual obligation. *See Zinter Handling, Inc. v. Gen. Elec. Co.*, 2005 WL 1843282, at *7 (N.D.N.Y. 2005). The parties agree that they began negotiating for the subject work as early as January 2009 and that the work commenced in June 2009. Plaintiff claims that the subcontractors were working on the presses "as early as May 17, 2010". Thus, plaintiff does not, and indeed, could not claim that defendant's alleged promise fraudulently induced plaintiff to enter into the contract or that defendant had the preconceived intention not to perform this promise **before** the contract was formed.

Based upon the allegations in the complaint and the documentation annexed thereto, the Court finds that plaintiff's fraud claim is duplicative of its breach of contract claim and thus, fails as a matter of law.

**C.    Misappropriation**

Plaintiff alleges that defendant improperly obtained plans, materials and specifications, which plaintiff defines as trade secrets and/or proprietary information, for pecuniary gain. Defendant argues that this information does not amount to trade secrets or proprietary

9

information.[6] Moreover, defendant argues that plaintiff has not alleged that defendant improperly used or disseminated any trade secrets or proprietary information.

A trade secret is " 'any formula, pattern, device, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Lehman v. Dow Jones & Co., Inc.*, 783 F.2d 285, 297 (2d Cir. 1986). "To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (quoting *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44 (2d Cir.1999)). Factors to be considered in determining whether a plaintiff possesses a trade secret include: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173, 1175 (2d Cir.1993). The most important factor is whether the information is a secret. *Lehman*, 783 F.2d at 298. The existence of a trade secret is usually treated as a question of fact, and, therefore, an analysis of these factors requires an examination of a developed record. *Am. Bldg. Maint. Co. of*

---

[6] In the Motion for Judgment on the Pleadings, defendant originally moved to dismiss plaintiff's misappropriation claims relating to photographs and videos. In opposition to the motion, plaintiff states, "[d]efendant submits irrelevant photographs of its Presses with its motion, even though the Complaint does not even remotely allege that any videos and pictures, including those of defendant's Presses, are Servotec's proprietary information or that defendant misappropriated them".

10

*New York v. Acme Prop. Servs., Inc*., 515 F.Supp.2d 298, 308 (N.D.N.Y. 2007); *see also Eberhard Inv. Assocs., Inc. v. Santino,* 2003 WL 22126846, at *4 (S.D.N.Y. 2003) (whether information is a trade secret is a factual issue not resolvable on a 12(b)(6) motion).

In the complaint, plaintiff asserts that, "V&O Press Company's engineering library is the plaintiff's proprietary information; said library includes microfilms of press blueprints, designs and other information for every V&O Press model built." Pltf. Complt. at ¶ 9. Plaintiff also contends that, "this information is not known to the public or others in plaintiff's trade and that plaintiff, "does not share information from its library with unauthorized personnel". *Id*. at 10,11. Plaintiff asserts that this information, "confers an economic advantage over those in similar businesses". *Id*. at 12. Plaintiff alleges, "upon information and belief, the defendant obtained the plaintiff's confidential, proprietary information, including blueprints, drawings, other materials from its engineering library, which constitutes a trade secret, and plans and other materials created by Berkshire Automation that were commissioned and paid for by the plaintiff". *Id*. at 79.

Plaintiff has sufficiently alleged that defendant obtained confidential information and used that information for its pecuniary gain. Defendant incorrectly asserts that absent an allegation that the defendant ever disclosed plaintiff's confidential or proprietary information to any third party, plaintiff can't succeed on its claim. *See Lapp Insulators LLC v. Gemignani*, 2011 WL 1198648, at *10 (W.D.N.Y. 2011) (discovery has not yet begun and additional facts relative to plaintiff's trade secrets and defendant's conduct will be revealed during discovery). The Court notes that Powers provided an affidavit detailing the parties communications regarding the alleged proprietary information/trade secrets. While Powers avers that the information was not

11

secret, that issue cannot be resolved by this Court at this stage of the litigation. Defendant's motion for judgment and dismissal of plaintiff's misappropriation claims is denied.

**D.     Injunctive Relief**

Defendant argues that injunctive relief is unwarranted because defendant has maintained exclusive possession of all photographs and other items plaintiff provided to them. Defendant finds support for this argument in Power's Affidavit. Based upon this Court's ruling that plaintiff has sufficiently plead a claim for misappropriation, defendant's motion to dismiss this cause of action is denied.

**II.     PLAINTIFF'S CROSS MOTION FOR JUDGMENT ON THE PLEADINGS**

Defendant asserts counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment and tortious interference with business relations. Defendant seeks, "judgment against plaintiff for the money paid to complete refurbishing and installing the subject presses along with the lost profits and other expenses and losses caused by plaintiff's inability to timely and efficiently complete the project". Plaintiff cross moves to dismiss these counterclaims.

When presented with such a motion for judgment on the pleadings and dismissal of counterclaims, the Court accepts all well pleaded factual assertions in the Answer as true and draws all reasonable inferences in favor of the defendant. *Net2Globe Int'l, Inc., v. Time Warner Telecom of New York*, 273 F.Supp.2d 436, 464 (S.D.N.Y. 2003) (citing, *inter alia, McGinty v. State of New York*, 193 F.3d 64, 68 (2d Cir. 1999)). "[T]he court will not dismiss the [counterclaims] unless it is satisfied that the [Answer] cannot state any set of facts that would entitle [the defendant] to relief." *Id*. (citing *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001)).

12

**A.     Counterclaim for Breach of Contract**

Defendant alleges that it, "retained plaintiff to timely refurbishing [sic] and installation of five (5) munition loading presses". Defendant further alleges that plaintiff promised to complete said project on or before December 2009 but was unable to fulfill that promise as agreed upon. Defendant contends that plaintiff's inability to complete the project by December 2009 or within defendant's budget resulted in a breach of contract. Plaintiff asserts that this counterclaim is "conclusory in fashion" and "fails to allege any plausible facts consistent with the documentary record".

Rule 8(a) provides that a claim for relief should contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Upon review, the Court finds that defendant has sufficiently plead the counterclaim to place plaintiff on notice of defendant's allegations. Defendant has set forth facts to withstand a motion to dismiss at this stage of the litigation and need not provide detailed evidence supporting its claims in its pleading. *See Textil RV LtdA v. Italuomo, Inc.*, 1993 WL 118503, at *3 (S.D.N.Y. 1993).

**B.     Counterclaim for Breach of the Covenant of Good Faith and Fair Dealing**

Plaintiff argues that New York law does not recognize a separate cause of action for the implied covenant when a breach of contract claim is also plead. Defendant disagrees arguing that the claim may be brought when, "one party deprives the other of the benefit of its bargain". "Under New York law, every contract contains an implied covenant of good faith and fair dealing." *Ebusinessware, Inc. v. Tech. Servs. Group Wealth Mgmt. Solutions, LLC*, 2009 WL 5179535, at *8 (S.D.N.Y. 2009) (citing *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87 (1933)). "[A] claim alleging a breach of good faith and fair dealing is duplicative of a breach

13

of contract claim, and where both are alleged the implied covenant claim generally should be dismissed." *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 320 (1995). A claim for breach of the covenant may be maintained "only if it is based on allegations different than those underlying the accompanying breach of contract claim." *TVT Records v. The Island Def Jam Music Group*, 244 F.Supp.2d 263, 277-78 (S.D.N.Y.2003).

Here, defendant asserts that the project was not completed "by the agreed upon deadline" therefore, defendant was "deprived of the benefit of its bargain". In the counterclaim, defendant also asserts, "[p]laintiff's inability to timely and efficiently complete the project has resulted in plaintiff's breach of its oral agreement with defendant". Def. Ans. at ¶ 147. As discussed *supra*, these allegations also formed the basis for defendant's breach of contract counterclaim. Thus, plaintiff's motion to dismiss the counterclaim for breach of covenant of good faith and fair dealing is granted. *See Net2Globe*, 273 F.Supp. at 467.

**C.     Counterclaim for Unjust Enrichment**

Plaintiff argues that the counterclaim asserts, "in conclusory fashion", that plaintiff was paid over $450,000.00 for work promised but not completed. Plaintiff claims that the record belies defendant's argument as it shows that defendant failed to pay plaintiff for its services. The dispute over the validity of contracts permits the claim of unjust enrichment as an alternative to breach of contract. *Net2Globe*, 273 F.Supp.2d at 466 ("a claim of unjust enrichment may serve as a basis for recovery should a trier of fact determine that, in fact, no valid contract was formed or that the contractual obligations did not encompass the events underlying the asserted basis for the unjust enrichment claim") (citing *Schwartz v. Asplundh Tree Expert Co., Inc*., 102 F.3d 660, 663 (2d Cir. 1996)). Accordingly, plaintiff's motion for judgment on the pleadings and dismissal of this counterclaim is denied.

14

**D.      Counterclaim for Tortious Interference with Business Relations**

Defendant asserts that it, "advised plaintiff that failure to meet its deadline to complete the presses would cause defendant to lose customers". Plaintiff argues that defendant failed to identify any customers or that plaintiff knowingly interfered with any relationship. Plaintiff claims that defendant asserts in conclusory fashion that defendant was, "prevent[ed] from filling orders" and, as a result, lost customers

"The elements of tortious interference with a contract are: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Advanced Mktg. Group, Inc. v. Business Payment Sys., LLC*, 300 F. App'x 48, 50 (2d Cir. 2008).

Here, the counterclaim fails to allege the aforementioned elements. Specifically, defendant has failed to cite to a valid contract between defendant and any third party, allege any facts relating to plaintiff's knowledge of that contract or that there was any actual breach of a contract. *See id.* (the claim also fails as it is silent on any wilful or intentional conduct to persuade a third party to breach). Thus, plaintiff's motion to dismiss the counterclaim for tortious interference is granted.

## CONCLUSION

It is hereby,

**ORDERED**, that defendant's motion for judgment on the pleadings (Dkt. No. 11) and dismissal of plaintiff's claims of fraud (Fifth Cause of Action) is **GRANTED**, it is further

15

**ORDERED**, that defendant's motion for judgment on the pleadings (Dkt. No. 11) and dismissal of plaintiff's claims of misappropriate of trade secrets and proprietary information (Sixth and Seventh Causes of Action) is **DENIED**, it is further

**ORDERED**, that defendant's motion for judgment on the pleadings (Dkt. No. 11) and dismissal of plaintiff's cause of action for injunctive relief is **DENIED**, it is further

**ORDERED**, that plaintiff's cross motion for judgment on the pleadings and dismissal of defendant's counterclaim for breach of contract (Dkt. No. 13) is **DENIED**, it is further

**ORDERED**, that plaintiff's cross motion for judgment on the pleadings and dismissal of defendant's counterclaim for breach of the implied covenant of good faith and fair dealing (Dkt. No. 13) is **GRANTED**, it is further

**ORDERED**, that plaintiff's cross motion for judgment on the pleadings and dismissal of defendant's counterclaim for unjust enrichment (Dkt. No. 13) is **DENIED**, it is further

**ORDERED**, that plaintiff's cross motion for judgment on the pleadings and dismissal of defendant's counterclaim for tortious interference with defendant's business interest (Dkt. No. 13) is **GRANTED**.

**IT IS SO ORDERED.**

Dated: October 6, 2011

_____
Mae A. D'Agostino
U.S. District Judge